UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRICON ENERGY, LTD. | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-03756 |
| | § | |
| THIRUMALAI CHEMICALS, LTD. | § | |
|     Defendant. | § | |

**TRICON'S BRIEF IN SUPPORT OF
ITS MOTION TO COMPEL ARBITRATION**

Pursuant to the Court's Case Management Order (Doc. No. 7) Paragraph 3, Tricon Energy Ltd. ("Tricon") respectfully submits its brief in support of its motion to compel arbitration.

## I.    INTRODUCTION

This case involves a Motion to Compel Arbitration filed by Tricon Energy Ltd., a Texas limited partnership with its principal office in Houston, that is in the international petrochemicals trading business.  Tricon entered into an agreement with Thirumalai Chemicals, Ltd. ("Thirumalai"), an Indian company, whereby Tricon agreed to sell and Thirumalai agreed to buy orthoxylene to be delivered to the Indian port of Chennai.  The parties also agreed to submit all disputes arising out of or relating to the agreement to arbitration administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules.  Tricon

seeks an order from this Court compelling arbitration pursuant to the agreement of the parties.

## II.   <u>BACKGROUND</u>

On January 15, 2014, a trader named Mark Vijay sent an inquiry to Tricon on behalf of Thirumalai, with the subject line "Regarding Petrochemical Import," asking whether Tricon was involved in the sale of orthoxylene ("OX") to India.[1] Tricon's trader Brad Lockwood responded to Vijay's inquiry and informed him that Tricon did sell OX to India and asked Vijay to "let us know your requirement(s) and price idea so that we may have a chance to offer your company."[2] Vijay responded with the information Lockwood requested and attached a Thirumalai spec sheet for OX.[3]

After this, the parties spoke by phone twice and Tricon made its first offer. Vijay identified himself as a trader for Thirumalai.[4] Following more discussion, Tricon sent a revised firm offer to sell 2,000-3,000 MT of OX to Thirumalai at

---

[1] *See* Ex. 1, 2014.01.14 Email from Vijay to Bansal, TRI00001, attached to Statement of Brad J. Lockwood ("Lockwood Statement") (Doc. 12).   Tricon is including the Lockwood Statement, which was filed with the Court, as an Exhibit as a courtesy.

[2] Ex. 1, 2014.01.14 Email from Lockwood to Vijay, TRI00003, attached to Lockwood Statement.

[3] Ex. 1, 2014.01.15 Email from Vijay to Lockwood, TRI00004, attached to Lockwood Statement.

[4] Ex. 1, Lockwood Statement at ¶ 2.

$1405 per MT, which Thirumalai ultimately accepted.[5]   After Tricon sent the revised offer, the parties again spoke about the deal over the phone.[6]   During this call, Vijay informed Lockwood that Thirumalai would accept the deal but asked for two additional terms Thirumalai wanted to include: one requiring Tricon to agree to the Chennai port's low-flash restrictions and another providing a 90 day instead of 60 day payment term.[7]   Tricon agreed to these additional terms.[8]   Both Tricon and Thirumalai said they would confirm the agreement in writing.[9]   After this phone conversation, each party sent written confirmation of the terms to which it had agreed.[10]

The price of OX dropped globally during the hours after Thirumalai accepted Tricon's offer.[11]   In the early morning hours of Saturday January 18 (in India), Vijay emailed Lockwood requesting that Tricon reduce the price for the deal.[12]   Lockwood told Vijay that Tricon would not reduce the price because the deal was made, and explained that Tricon could not ask a customer to pay more if

---

[5] *See id.* at ¶¶ 3, 4, 7-9.

[6] *See id.* at ¶ 10.

[7]  *See* Lockwood Statement at ¶10.

[8] *Id.*

[9] *Id.*

[10] *Id.* at ¶12.

[11]  *Id.* at ¶15.

[12] *See id.* at ¶16.

the price had gone up.[13]   Vijay accepted Lockwood's refusal, replying "Thanks Brad, Sure, let's connect tonight."[14] Thereafter the parties continued to act as if a contract for the sale of OX existed.[15]

A few days after the parties made their agreement, Tricon sent Thirumalai its written Sales Contract, which included additional terms and conditions that Tricon proposed to add to the agreement.[16]   One of the terms was an agreement to arbitrate.[17]   It is common in international petrochemicals trading for parties to exchange written agreements containing additional terms and conditions after a binding contract exists.[18]   Legally, this practice operates as a modification to the parties' agreement.  *See* TEX. BUS. & COM. CODE § 2.209(a).

After Thirumalai received it, Lockwood and Vijay discussed the terms and conditions in the written Sales Contract by phone.[19]   Vijay said Thirumalai needed to add two more terms to the Sales Contract, but did not ask for any other changes

---

[13] Ex. 1, 2014.01.18 Email from Lockwood to Vijay, TRI00015, attached to Lockwood Statement.

[14] Ex. 1, 2014.01.20 Email from Vijay to Lockwood, TRI000015, attached to Lockwood Statement.

[15] *See* Ex. 1, Lockwood Statement at ¶17-20.  *See also* pp. 10-11, *infra* and fn. 50, *infr*a.

[16] *See* Ex. 1, Lockwood Statement at ¶21.

[17] *Id.*

[18] *Id.; see also* Ex. 2, Declaration of Steve C. Simpson ("Simpson Declaration") at ¶ 12.

[19] *See* Ex. 1, Lockwood Statement at ¶22.

- 4 -

to the Tricon terms and conditions, which he accepted.[20]  Tricon agreed to both of Thirumalai's additions.[21]  After the phone conversation, Vijay responded in writing to Tricon's email attaching the Sales Contract and reiterated the two more terms he had discussed with Lockwood over the phone.[22]  Thirumalai did not mention any disagreement with or changes to the arbitration agreement in its email or during the parties' phone discussions about the Sales Contract.[23]

After adding the additional terms from the Sales Contract discussions, the parties moved forward with implementing the transaction by starting the work on logistics, discussing loading and delivery windows, exact quantity (the agreement provided 2000-3000 MT, exact quantity at Seller's option), letter of credit arrangements, etc.[24]  On February 7, Tricon agreed to move the load window from February to April, but reminded Thirumalai that the price and other terms from the parties' agreement remained in effect.[25]  After this, the parties continued discussing logistical issues surrounding the credit arrangements and timing.[26]  It would be

---

[20] *Id.*

[21] *Id.*

[22] *See* Ex. 1, Lockwood Statement at ¶23.

[23] *See id.* at ¶¶22-23, 26.

[24] *See id.* at ¶¶24, 27.

[25] *See id.* at ¶27.

[26] *Id.* at ¶¶27-28.

nearly another month before Thirumalai would first claim that the parties had not made a binding contract for the deal.[27]

Ultimately Thirumalai refused to perform its contractual obligation to secure a letter of credit. Tricon continued to urge Thirumalai's performance, but Thirumalai refused and the present dispute arose.

## III.   ARGUMENT AND AUTHORITIES

### A.   The Parties Agreed to Arbitrate this Dispute.

In determining whether to compel arbitration under the Federal Arbitration Act, courts must determine whether the parties agreed to arbitrate the dispute. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012). "[O]rdinary state-law principles that govern the formation of contracts" apply to determine whether an agreement to arbitrate exists. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). Therefore, the Court will look to Texas law on contract formation—and specifically the Texas U.C.C.—to determine whether the parties have agreed to arbitrate.

---

[27] *See* Ex. 3, 2014.03.04 Email from Vijay to Lockwood, THI0000151 (produced by Thirumalai).

00202555.DOCX; 4

### 1.    The parties made a contract for the sale of OX on January 16, 2014.

Under Texas law, a contract can "be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Tex. Bus. & Com. Code § 2.204(a).  Although the U.C.C. allows a contract to be shown by conduct, the traditional common law elements of offer and acceptance also apply.

An offer is "an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal." *Axelson, Inc. v. McEvoy-Willis, a Div. of Smith Intern. (N. Sea), Ltd.*, 7 F.3d 1230, 1232-33 (5th Cir. 1993) (applying the Texas U.C.C.).  Tricon's second January 16, 2014 email from Brad Lockwood to Mark Vijay was an offer.  It provided all of the material terms for Tricon's sale of OX to Thirumalai, including price, quantity, quality, load window and discharge port.[28]  It invited acceptance and stated that it was valid until noon the next day in India.[29]

Under the Texas U.C.C. an "offer to make a contract shall be construed as inviting acceptance in *any manner and by any medium* reasonable in the circumstances," unless "otherwise unambiguously indicated by the language or circumstances."  Tex. Bus. & Com. Code Ann. § 2.206 (emphasis added).  As

---

[28] *See* Ex. 1, Lockwood Statement at ¶9, and 2014.01.16 Email from Lockwood to Vijay, TRI00007, attached to Lockwood Statement.

[29] *Id.*

explained in detail in the Statement of Brad Lockwood, Tricon and Thirumalai's traders spoke about the deal over the phone after Lockwood sent the revised firm offer.[30]   Vijay informed Lockwood verbally that Thirumalai accepted the offer.[31] In the same conversation, Vijay requested that two additional terms be added to the parties' agreement:  (1) that Tricon agree to abide by the low-flash requirements at Chennai port; and (2) that the payment terms be extended from 60 to 90 days from the bill of lading.[32] Lockwood agreed to both of these terms immediately.[33]  At this point, a contract was formed under Texas law.   "A definite and seasonable expression of acceptance . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."  Tex. Bus. & Com. Code § 2.207(a).

The verbal acceptance by Vijay was definite, seasonable and reasonable in the circumstances, occurring before the offer's validity window expired.   Under Section 2.207, the additional terms Thirumalai requested regarding low flash port restrictions and 90 instead of 60 days for payment are "construed as proposals for addition to the contract" and become part of the contract unless:  "(1) the offer

---

[30] *See* Ex. 1, Lockwood Statement at ¶10.

[31] *Id.*

[32] *See* Ex. 1, Lockwood Statement at ¶10.

[33] *Id.*

expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." TEX. BUS. & COM. CODE § 2.207(b).  Lockwood's offer did not expressly limit acceptance to the terms in the offer.[34]  Further, as evidenced by Lockwood's immediate verbal agreement, the two additional terms did not materially alter the contract.

While imposing some additional logistical burden on Tricon as seller, the burden was not material given the size of the deal and Lockwood agreed to the low flash port restrictions on the phone call with Vijay.[35]  Likewise, the change from a 60 day to a 90 day payment term was also not material given the size of the deal. The total price of the OX involved in the deal was more than $4.2 million USD. The interest on this amount for an additional 30 days would have been less than $20,000.[36]  In accordance with the non-material nature of this change, Lockwood agreed to the 90 day payment term immediately.[37]

Lastly, Tricon had not given and never did give notice that it objected to these two additional terms.  To the contrary, Tricon agreed to the terms the

---

[34]  *See* Ex. 1, 2014.01.16 Email from Lockwood to Vijay, TRI00007, attached to Lockwood Statement.

[35] *See* Ex. 2, Simpson Declaration at ¶ 13.

[36] Ex. 1, Lockwood Statement at ¶11.

[37] *See id.* at ¶10.

00202555.DOCX; 4

moment they were brought up and confirmed its agreement in writing.[38]   The parties had an agreement under the Texas U.C.C. the moment Vijay communicated Thirumalai's acceptance to Lockwood on the phone.

After this phone conversation, Vijay confirmed Thirumalai's acceptance in writing, stating:  "As discussed with you, we will be able to accept the offer, subject to 90 days credit,"[39] to which Tricon had already agreed. This email again shows Thirumalai's "definite and seasonable expression of acceptance." TEX. BUS. & COM. CODE § 2.207(a).  A contract was formed despite the additional terms.  *See id.*  The only remaining question at this point was what terms the contract included.

### 2. The parties conduct after January 16 also establishes the existence of a binding contract.

"Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title."  TEX. BUS. & COM. CODE § 2.207(c).  The conduct of both parties in the days following Thirumalai's January 16 email acceptance clearly recognizes the existence of a binding contract.

---

[38] *See id.* at ¶¶10, 11, 17.

[39] Ex. 1, 2014.01.16 (2014.01.17 in India) Email from Vijay to Lockwood, TRI00008, attached to Lockwood Statement.

Less than an hour after Thirumalai confirmed its acceptance by email on January 16,[40] Thirumalai sent its financial reports to Tricon so that Tricon could conduct a credit check.[41]  Tricon's revised offer provided the following payment terms:  "60 days from BL date via documentary letter of credit from a Tricon approved bank (No LC required if your company is approved for open account by our credit department)."[42]  Thus, the contractual term provided for either credit or a letter of credit.  In the implementation of this term and in accord with Thirumalai's desire to do the deal on an open account, Vijay forwarded three different financial reports shortly after he confirmed Thirumalai's acceptance by email.[43]  This is conduct "which recognizes the existence of a contract." Vijay would not have forwarded this information if the parties did not have a contract.[44]

---

[40] The parties were located in two different time zones, which differed by 11.5 hours, during all negotiations.  Because of this, at times the dates of specific emails are also different. Thirumalai's email confirming acceptance was sent on January 16 in Houston, which was January 17 in India.  *See id.*; *see also* Ex. 1, Lockwood Statement at ¶12.

[41] *See* Ex. 1, Lockwood Statement at ¶14.

[42] Ex. 1, 2014.01.16 Email from Lockwood to Vijay, TRI000007, attached to Lockwood Statement.

[43] Ex. 1, 2014.01.16 Email from Vijay to Lockwood, TRI000056, attached to Lockwood Statement.

[44] *See* Ex. 1, Lockwood Statement at ¶14; *see also* Ex. 2, Simpson Declaration at ¶8.

00202555.DOCX; 4

### 3. Vijay's request for a price reduction did not change the contract.

Less than a day after accepting Tricon's offer, the price of OX dropped across the globe.[45]  In the early morning hours of January 18 in India (1:24 a.m. India Time, 1:54 p.m. January 17 in Houston), Vijay emailed Lockwood requesting a price reduction.[46]  His request stated:  "OX has fallen $25 today across all geographies -- we would like to have a $25 reduction."[47]  Importantly, this request is phrased as an inquiry into reducing the price, not a counter-offer.  Lockwood responded a few minutes later, informing Vijay that Tricon would not agree to reduce the price of the deal and explained:

> When we (Tricon) do spot business, I can't retroactively ask suppliers for discounts when the price fall(s), and I surely can't ask the customer to pay more when the price goes up.  If the market had gone up $25/mt today, would you accept to pay more?  Of course not, nor would I ask.  Also, I can't go to the vessel owners and ask for a reduction in freight because the customer would like to pay less or the supplier would like for me to pay more.  Business just wouldn't work like that.[48]

In this same email, Lockwood also confirmed Tricon's earlier agreement to the 90 day payment term.[49]  He further provided: "So, the acceptance you had sent on the

---

[45]  *See* Ex. 1, Lockwood Statement at ¶15.

[46]  Ex. 1, 2014.01.17 Email from Vijay to Lockwood, TRI0000012, attached to Lockwood Statement.

[47]  *Id.*

[48]  Ex. 1, 2014.01.18 Email from Lockwood to Vijay, TRI0000015, attached to Lockwood Statement.

[49]  *Id.*

00202555.DOCX; 4

16th basis 90 day payment was agreed to."[50]  Vijay responded stating "Thanks Brad, Sure, lets connect tonight."[51]

Vijay's request for a price reduction was an inquiry about an accommodation, not a counter-offer.  But even if it was a counter-offer, Lockwood clearly rejected it, and by saying "Thanks Brad, Sure let's connect tonight" Vijay clearly acknowledged Tricon's rejection and accepted the original deal.  After that, the parties continued to act in recognition of the existence of a contract.[52]

### 4. The parties modified the contract to include additional terms, including an agreement to arbitrate.

Under the Texas U.C.C., parties may agree to modify an existing contract without consideration.  TEX. BUS. & COM. CODE § 2.209(a).  "[N]o 'formal' offer and acceptance [is required] for a contract modification to be effective as between the parties."  *Pennzoil Co. v. F.E.R.C.*, 789 F.2d 1128, 1144 (5th Cir. 1986).

---

[50] *Id.*

[51] *Id.*

[52] For example, on January 21, Thirumalai requested Tricon to inform it of the exact volume, which the parties' contract left to Tricon's option (2014.01.21 Email from Vijay to Lockwood, TRI0000021); on January 22 Tricon sent Thirumalai its written Sales Contract with additional terms and conditions (2014.01.22 Email from Lockwood to Vijay and attachment, TRI0000024-27) which the parties discussed by telephone (Lockwood Statement ¶ 21); Thirumalai requested that two more terms be added to the terms and conditions (2014.01.22 Email from Vijay to Lockwood, TRI0000028); Lockwood and Vijay discussed details of the credit terms, credit insurance or letter of credit arrangements (*See* Ex. 4, 2014.01.22 Email from Lockwood to Vijay, THI000066; and Ex. 5, 2014.01.31 Email from Lockwood to Vijay, THI000069 (both produced by Thirumalai). *See* Ex. 1, Lockwood Statement and attachments, for TRI0000021, 24-27, 28.

- 13 -

Here, the parties modified their agreement to include certain additional terms, including the agreement to arbitrate. *See e.g., In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (forum selection clause contained in a later agreement governed even where the original purchase order did not have any such provision). After the parties made the contract for the sale of OX, Lockwood sent Vijay a written Sales Contract, which included all of the terms the parties had agreed to and additional terms and conditions.[53]  As explained in the Statement of Brad Lockwood and the declaration of Steve Simpson, it is common in petrochemicals trading for parties to "pass paper" to negotiate additional terms after a deal has been made.[54]

After Vijay received the Sales Contract with the additional terms, he and Lockwood discussed the Sales Contract by phone. Vijay said Thirumalai needed to add two more additional terms:  (1) a term requiring Tricon to abide by the Chennai port low-flash restrictions; and (2) a term requiring Tricon to pay for the letter of credit charges, but did not ask for any other changes to the Tricon terms and conditions.[55]  Lockwood agreed to both terms. *Id.*   Lockwood "left the

---

[53] *See* Ex. 1, Lockwood Statement at ¶21; 2014.01.22 Email from Lockwood to Vijay, TRI0000024-27.

[54] *See* Ex. 1, Lockwood Statement at ¶21; *see also* Ex. 2, Simpson Declaration at ¶12.

[55] *See* Ex. 1, Lockwood Statement at ¶22.

00202555.DOCX; 4

conversation with the clear understanding that Thirumalai had no problem with the Tricon terms and conditions and accepted them."[56]

Vijay then responded in writing to Lockwood's email attaching the Sales Contract and reiterated Thirumalai's two requested changes.  He also stated: "Regarding any other changes and the bank where we will open our LC, I will let you know."[57]  Vijay never asked for other changes.  This followed from the phone conversation, where Vijay said that there were only two additional terms Thirumalai needed to add to the Sales Contract and that otherwise the terms were acceptable.[58]  Vijay's actions are a clear "manifestation of an intent to depart from the terms of the original contract."  2A LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2-209:42 (3d Ed.).

Here, Thirumalai was not merely silent with regard to the additional terms in Tricon's Sales Contract.  Thirumalai received the Sales Contract with the additional terms.  It discussed the Sales Contract by phone with Tricon.  It asked to add two more terms, but asked for no other changes.  It confirmed its request for two more terms in writing.  Vijay told Tricon that if Thirumalai needed any "other changes" to the terms and conditions in the Sales Contract "I will let you know."  It

---

[56] *Id.*

[57] Ex. 1, 2014.01.23 Email from Vijay to Lockwood, TRI0000028, attached to Lockwood Statement.

[58] *See* Ex. 1, Lockwood Statement at ¶23.

never asked for other changes.  Under these circumstances, Tricon reasonably had

"the clear understanding that Thirumalai had no problem with the Tricon terms and

conditions and accepted them."[59]

This Court considered a similar set of facts in *Den Norske Stats Oljeselskap,*

*A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913, 915 (S.D. Tex. 1998)

(Hughes, J.), *aff'd* 161 F.3d 8 (5th Cir. 1998).  In that case, a deal to sell propane

was negotiated over the phone, and the broker sent a fax confirming the deal.  *Id.* at

914.  The seller did not respond to the confirming fax, and later argued that the

parties had not formed a valid contract but that the confirming faxes were "mere

offers."  *Id.*  This Court held that the parties' conduct evidenced a valid contract.

*Id.* at 915.  The seller's failure to respond in writing to the confirming memo was

meaningless; the only "reasonable interpretation of the facts is that contracts were

formed."  *Id.*  Quoting Williston on Contracts, this Court noted:

> It is true that, generally speaking, an offeree has a right to make
> no reply to offers, and hence that his silence is not to be
> construed as an acceptance. But, where the relation between the
> parties is such that the offeror is justified in expecting a reply,
> or the offeree is under a duty to reply, the latter's silence will be
> regarded as acceptance. Under such circumstances, "one who
> keeps silent, knowing that his silence will be misinterpreted,
> should not be allowed to deny the natural interpretation of his
> conduct," etc.  WILLISTON ON CONTRACTS, §§ 91, 91a.

*Id.* (quoting *Laredo Nat'l Bank v. Gordon*, 61 F.2d 906, 907 (5th Cir. 1932)).

---

[59] *See* Ex. 1, Lockwood Statement at ¶22.

As in *Den Norske*, Texas law and the facts of this case support the clear conclusion that the parties modified the earlier agreement to add the terms and conditions of the Sales Contract, including the agreement to arbitrate.   Arbitration agreements are common in international petrochemicals trading.[60]   If Thirumalai had concerns with the agreement to arbitrate, it would have voiced those concerns either in the phone conversation where Sales Contract was discussed or the email it sent confirming the conversation in writing.[61]    It did not.

**B.     Mark Vijay Had Actual and Apparent Authority to Make the Contract.**

A principal is liable for the acts of as its agent when the agent has actual or apparent authority to do those acts or when the principal ratifies those acts. *Spring Garden 79U, Inc. v. Stewart Title Co.,* 874 S.W.2d 945, 948 (Tex. App.—Houston [1st Dist.] 1994, no pet.). An agent's authority to act on behalf of a principal depends on words or conduct by the principal either to the agent (actual authority) or to a third-party (apparent authority). *Id.* at 950; *see also Walker Ins. Servs. v. Bottle Rock Power Corp.,* 108 S.W.3d 538, 550 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Suarez v. Jordan*, 35 S.W.3d 268, 272–73 (Tex. App.—Houston [14th Dist.] 2000, no pet.).   Here, Mark Vijay had both actual authority and apparent authority to enter into the contract to purchase OX from Tricon.

---

[60] *See* Ex. 1, Lockwood Statement at ¶25; *see also* Ex. 2, Simpson Declaration at ¶13.

[61] Ex. 2, Simpson Declaration at ¶13.

### 1.   Vijay had actual authority.

Actual authority can be either express or implied.   *See Reliant Energy Services, Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App.—Houston [1st Dist.] 2011, no pet.).   Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal.   *Crooks v. MI Real Estate Partners, Ltd.*, 238 S.W.3d 474, 483 (Tex. App.—Dallas 2007, pet. denied). Implied authority is the authority of an agent to do whatever is necessary and proper to carry out the agent's express powers.   *Id.*

To show actual authority, there must be evidence that either (1) the principal intentionally conferred authority on another to act as its agent, or (2) the principal intentionally, or by a want of due care, allowed another to believe that it possessed authority to act as the principal's agent.   *See Reliant Energy Services*, 336 S.W.3d at 783.   To determine whether an alleged agent had actual authority, Texas courts examine the words and conduct by the principal to the alleged agent about the alleged agent's authority to act for the principal.   *Id.*

Here, Thirumalai's internal emails belie any claim that it did not authorize Mark Vijay to make contracts on its behalf.   On January 16, 2014, at 5:15 p.m. India time and a few hours after Brad Lockwood had sent Tricon's initial offer to sell OX to Thirumalai at $1420 per MT, Vijay emailed C. G. Sethuram,

- 18 -

Thirumalai's CEO, copying two other people with Thirumalai email addresses.[62]
Vijay informed his CEO and the others that Tricon had offered to sell OX for
$1420 per MT, described the other terms of the offer and provided context for
Tricon's offer.[63]   He then asked:   "Shall I indicate that demurrage will not be
bearing by TCL, and also big at 1380-1400 when I talk tonight since PX has also
been falling[?]"[64]   Sethuram responded to Vijay the same day and stated:   "My
guess will be that OX will remain at 1370-1380 level in Feb and March. Thus
buying at 1420 is OK.   Try negotiation at 1400. Shipment in Feb beginning
possible? Please let us know after you talk. Please take a 24 hour window to revert
to him."[65]

At 8:45 that evening in India, Vijay emailed Sethuram and the others again
and explained that Tricon was going to revise its offer, including reducing the price
to near $1400 and extending the validity term of its initial offer (but mentioning
that Lockwood had said a full 24 hour validity may not be possible.[66]   Then, Vijay
emailed again at 9:27 p.m. India Time (9:57 a.m. in Houston), a little less than an
hour after Lockwood sent Tricon's revised offer (sent at 9:12 a.m. Houston time,

---

[62] *See* Ex. 6, 2014.01.16 Email from Vijay to Sethuram, THI 0000193.

[63] *Id.*

[64] *Id.*

[65] Ex. 7, 2014.01.16 Email from Sethuram to Vijay, THI 0000195.

[66] Ex. 8, 2014.01.16 Email from Vijay to Sethuram, THI 0000199.

00202555.DOCX; 4

8:42 p.m. India Time), noting: "The offer is at 1405."[67]  Sethuram responded early in the morning of January 17 in India (12:54 a.m.), stating: "Can we close it at 1405?"[68]  Vijay emailed the group at 8:13 a.m. India Time on January 17 (8:43 p.m. January 16 Houston Time) and provided details on load window and estimated arrival at Chennai port.[69]  He then said: "Will confirm our acceptance via email."[70]

A few hours later, Vijay emailed Lockwood and confirmed Thirumalai's acceptance in writing.[71]  He followed up with Sethuram about six hours later, stating: "I confirmed the order subject to their offering 90 days credit—they were offering 60."[72]  He then said: "Since price has fallen, I believe they should accept for 90 days and close the deal -- but in case they stay put, is it acceptable to renegotiate price using this as a handle, since there has been a $10-$25 fall in OX this week -- would like to know if that is okay/correct."[73]  Sethuram responded:

---

[67] Ex. 9, 2014.01.16 Email from Vijay to Sethuram, THI0000200.

[68] Ex. 10, 2014.01.17 Email from Sethuram to Vijay, THI 0000201.

[69] Ex. 11, 2014.01.17 Email from Vijay to Sethuram, THI0000206.

[70] *Id.*

[71] *See* TRI000008, attached to Statement of Brad J. Lockwood.

[72] Ex. 12, 2014.01.17 Email from Vijay to Sethuram, THI 0000207.

[73] *Id.*

"Why not ask 25$ reduction?  After all we are in business to make profits."[74]

Vijay replied:  "Thank you for your encouragement, Sir.  Will do."[75]

The emails between Vijay and Thirumalai's CEO continue, with Vijay informing Sethuram that Tricon agreed to the 90 day payment terms but refused to discount the price.[76]  Notably Vijay said:  "Learning:  Regardless of the expiry of the validity, maybe I should have stretch the confirmation to the evening… (although there could be a mild risk of losing parcel)."[77]  Confirming Vijay's authority, Sethuram said:  "I think we can go ahead and confirm 1405 90 days."[78]

These emails clearly show Sethuram expressly authorized Vijay to make the contract with Tricon on behalf of Thirumalai.  Each step in Vijay's negotiations with Tricon was authorized by Thirumalai's CEO, and the terms Sethuram authorized are the terms to which Vijay agreed.  Here, there is no question Sethuram intentionally conferred authority upon Vijay to act of Thirumalai's behalf.  Given Vijay's actual authority to contract on behalf of Thirumalai, Vijay's later agreement to modify the parties agreement and add the terms and conditions in the Tricon Sales Contract was impliedly authorized, as it was "necessary and

---

[74] Ex. 13, 2014.01.17 Email from Sethuram to Vijay, THI 0000208.

[75] Ex. 14, 2014.01.17 Email from Vijay to Sethuram, THI0000209.

[76] Ex. 15, 2014.01.18 Email from Vijay to Sethuram, THI0000210.

[77] *Id.*

[78] Ex. 16, 2014.01.18 Email from Sethuram to Vijay, THI0000212.

proper" to carry out the agent's express authority to buy OX from Tricon.  *Crooks v. MI Real Estate Partners, Ltd.*, 238 S.W.3d at 483.

### 2.    Vijay also had apparent authority.

Although Vijay's actual authority is sufficient, he also had apparent authority to contract on behalf of Thirumalai.  An agent has apparent authority when the principal leads a third party to believe that the agent has authority.  *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex.2007); *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex.1996).  Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise. *Gaines*, 235 S.W.3d at 182.

Here, Thirumalai's CEO knew Vijay presented himself as a Thirumalai trader with the authority to make contracts for the company the day after Vijay contacted Tricon.[79]  Even if Vijay didn't have actual authority, which the emails clearly show he did, Sethuram's knowledge that Vijay was presenting himself as a Thirumalai trader and negotiating a deal as of January 16, 2014, and failure to do anything to correct this representation to Tricon, lacked ordinary care.

---

[79] *See* Ex. 6, 2014.01.16 Email from Vijay to Sethuram, THI 0000193.

00202555.DOCX; 4

Further, Tricon was reasonable in believing Vijay had the authority to make the contract.   An international petrochemicals trader has certain generally recognized duties, chief of which is the making of contracts.[80]  One whose position carries generally recognized duties has "apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent." *See* RESTATEMENT (SECOND) OF AGENCY § 27 comment a at 104 (1958), quoted in *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 265 n.16 (5th Cir. 1980). Lockwood's belief that Vijay, who approached Tricon seeking to purchase OX for Thirumalai, had authority to make a contract for Thirumalai to purchase OX was entirely reasonable.   Any special limitations upon Vijay's authority were not communicated and would have been abnormal, given Vijay's position and the facts of his negotiations with Tricon.

### C.    The Original Contract and the Modification Both Satisfy the Statute of Frauds.

Under the U.C.C., the only essential term that must be contained in a written agreement for the sale of goods over $500 is the quantity.   *Westlake Petrochemicals, L.L.C. v. United Polychem*, Inc., 688 F.3d 232, 240 (5th Cir.

---

[80] *See* Ex. 1, Lockwood Statement at ¶¶5-6; *see also* Ex. 2, Simpson Declaration at ¶5-7. As Simpson explains, international petrochemicals traders are assumed to have authority to make contracts for their companies. Ex. 2, Simpson Declaration at ¶5.  If a trader does not have authority, or has limitations on his or her authority, this information is communicated upfront. *Id.* at ¶5.

2012), as revised (Aug. 7, 2012) (citing TEX. BUS. & COM. CODE § 2.201(a), cmt. 1).   Further, under Texas law a person's name in an email satisfies the signing requirement.   *See* TEX. BUS. & COM. CODE § 1.201(b)(37); *id.* cmt. 37; TEX. BUS. & COM. CODE § 2.201; *see also Williamson v. Bank of New York Mellon*, 947 F. Supp. 2d 704, 710 (N.D. Tex. 2013) (noting that a number of other courts have found that names typed at the end of emails can be signatures under various states' statutes of frauds and collecting cases); *Tricon Energy, Ltd. v. Vinmar Intern., Ltd.*, 4:10-CV-05260, 2011 WL 4424802, at *11 (S.D. Tex. Sept. 21, 2011), aff'd, 718 F.3d 448 (5th Cir. 2013) (holding that emails between the parties represented signed writings under the Texas UCC); *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295-96 (7th Cir. 2002) ("[T]he sender's name on an e-mail satisfies the signature requirement of frauds."); *Lamle v. Mattel, Inc*., 394 F.3d 1355, 1362 (Fed Cir. 2005) (name on email satisfies the statute of frauds); *Cox Eng'g, Inc. v. Funston Mach. &Supply & Co.*, 749 S.W.2d 508, 511 (Tex. App.—Fort Worth 1988, no writ) (invoice letterhead constituted signature under § 1.201).

Vijay's January 16 email confirming Thirumalai's acceptance satisfies the statute of frauds.[81]   In it, Vijay responded to Tricon's written firm offer, which contained quantity as well as price and other key terms, stating "we will be able to

---

[81]   *See* Ex. 1, 2014.01.17 Email from Vijay to Lockwood, TRI00008, attached to Lockwood Statement.

accept the offer," and signed the email "Regards, Mark."[82]   Likewise, Vijay's January 22 email confirming Thirumalai's agreement to modify the already-made contract to include Tricon's written Sales Contract satisfies the Texas statute of frauds.[83]   Vijay stated:  "following two points need to be included in the sales contract as discussed," listed two additional terms, then noted "regarding any other changes and the bank where we will open our LC, I will let you know.  Thanks, Mark."[84]

Even if this writing were construed as insufficient the merchant memo exception to the statute of frauds would apply.  *See* TEX. BUS. & COM. CODE § 2.201(b).   Under the exception, if a writing in confirmation of a contract is received and the party receiving it has reason to know its contents, it satisfies the writing requirements unless written notice of objection is given within ten days after it is received.[85]   Thirumalai received the written Sales Contract, obviously reviewed it (and proposed additional terms), and did not object.  Thirumalai's lack of objection to the written contract independently satisfies the statute of frauds.

---

[82] *Id.*

[83] *See* Ex. 1, 2014.01.22 Email from Vijay to Lockwood, TRI000028, attached to Lockwood Statement.

[84] *Id.*

[85] *Id.*

## IV.    CONCLUSION

As demonstrated by the foregoing discussion, Tricon and Thirumalai have a valid and enforceable agreement to arbitrate this dispute.  The parties agreed to the basic terms of the transaction, including price, load window, and payment term. After a binding contract existed, the parties modified the contract to include additional terms and conditions from Tricon's written Sales Contract and Thirumalai's acceptance email, including the agreement to arbitrate.  Thirumalai's assent to this modification was evidenced by its email to Tricon, whereby it brought up its only two concerns with the additional terms and conditions.  Tricon agreed to Thirumalai's two additional terms.  The parties then began to implement the logistical and credit terms of the agreement. Lastly, Thirumalai's express email authorizations to Vijay and its lack of due care in correcting Tricon's reasonable understanding that Vijay was a trader with authority to make contracts for Thirumalai, establish Vijay had both actual and apparent authority to make the contract.

Because the parties have an enforceable arbitration agreement, this Court should compel arbitration of the parties' dispute.

Respectfully submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By: */s/ George R. Diaz-Arrastia*

George R. Diaz-Arrastia
State Bar No. 05805600
S.D. Texas Federal I.D. No. 12
Pennzoil Place ~ North Tower
700 Milam Street, 10th Floor
Houston, Texas  77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510
Email: gdarrastia@sdablaw.com

ATTORNEY-IN-CHARGE FOR PLAINTIFF
TRICON ENERGY, LTD.

OF COUNSEL:

William W. Russell
State Bar No. 00794573
S.D. Texas Federal I.D. No. 200426
Email: wrussell@sdablaw.com
Briana J. Bassler
State Bar No. 24059433
S.D. Texas Federal I.D. No. 980817
Email: bbassler@sdablaw.com
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place ~ North Tower
700 Milam Street, 10th Floor
Houston, Texas  77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510

- 27 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2016, a true and correct copy of the foregoing document was served on all counsel of record by electronic mail:

> Jeff Joyce
> jjoyce@jmlawyers.com
> Huma Ali
> hali@jmlawyers.com
> 712 Main Street, Suite 1500
> Houston, Texas  77002
> Telephone: (713) 222-1112
> Facsimile: (713) 513-5577
>
> ATTORNEYS FOR DEFENDANTS


> *George R. Diaz-Arrastia*
> George R. Diaz-Arrastia

00202555.DOCX; 4