# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRICON ENERGY, LTD. <br> PLAINTIFF | § <br> § <br> § <br> § | |
| VS. | § | CIVIL ACTION NO. 4:15-cv-3756 |
| | § <br> § | |
| THIRUMALAI CHEMICALS, LTD. <br> DEFENDANT | § <br> § | |

## DECLARATION OF STEVE C. SIMPSON

My name is Steve C. Simpson. I am a citizen of the United States and over the age of 18. I am fully competent to make this statement. This statement is based upon my personal knowledge of the petrochemical trading industry and my personal experience trading petrochemicals.

1. I was a trader and executive of specialty products and petrochemicals at Kerr-McGee Refining Corporation and Valero Energy Corporation. I own a consulting company where I have consulted on an MSAT 11 petrochemical project, made petrochemical trading recommendation, wrote a weekly petrochemical trading newsletter and also served as an expert witness. I traded petrochemicals for the last twenty years and have over thirty five years trading experience in crude oil, refined products, futures, specialty products and petrochemicals both in domestic and international markets. I have participated in high level negotiations on long term and short term (spot) contracts. In addition I have initiated new projects which include commercial development of new

petrochemical projects at different refineries. A copy of my resume is attached.

2. I have been hired by Schirrmeister Diaz-Arrastia Brem LLP law firm to be an expert witness in a civil action between Tricon Energy, LTD (Plaintiff) vs. Thirumalai Chemicals, LTD. (Defendant). I am paid for my time at the rate of $400 per hour.

3. I have reviewed documents in this case labelled TRI 000001 to TRI 000306 and THI 000001 to THI 000244. I have also reviewed a statement to the court from Brad Lockwood, regarding this action.

4. From the information I have reviewed, it appears that Thirumalai was inquiring regarding a purchase of orthoxylene (OX) for delivery to India from Tricon. The pricing of petrochemicals like OX can be extremely volatile. Prices can move based upon a variety of reasons such as changes in the price of crude oil in the world markets, supply strength or weakness of various petrochemicals, price changes of petrochemical feedstocks, immediate feedstocks or finished products. Price changes can also be moved by world events plus various other issues. For this reason, spot deals are made quickly. Price volatility is an unknown so time is of the essence.

5. In this industry a trader is defined as a person who buys and sells various products, like OX. It is customary for traders to have authority to make deals because that is what a trader does. When a trader needs approval from another person in his company the trader must communicate that information very clearly to his counterparty. If the trader does not inform the other party, they and the industry assume that person has the authority to make the contract. It is a standard in the domestic and international

petrochemicals and petroleum markets that traders have authority to conclude and to contractually obligate purchase or sales they negotiate unless the contrary is stated upfront and should be in writing.

6. The amount of time that a spot offer is valid can be minutes or hours. If limitations on the trader's authority has not been communicated up front, it is understood that the trader has authority. In my experience, a contract has been agreed upon when the major issues have been accepted by both parties and the trader accepts an offer. Major issues that are agreed upon by both parties are product, quality, quantity, price, shipment window, Inco terms, payment terms and discharge port for a delivery. After an offer has been accepted and a deal done, other contract points are agreed to and discussed after "paper is pass" (contract terms and conditions) to the other party. They either accept them or discuss possible changes. In the majority of cases the seller's contract terms and conditions are used in the contract.

7. From the information I have reviewed, it appears that Mark Vijay's job is to acquire OX for his company, Thirumalai. If Vijay did not have the authority to contractually obligate Thirumalai, Vijay should have noted any limitations to his authority immediately upon starting discussions to purchase the OX.

8. The information I have reviewed shows that on January 15, 2014, Vijay requested Lockwood to make an offer for Tricon to sell OX to Thirumalai. (TRI 000004). Lockwood sent Vijay an offer on January 16 (TRI 000005) and later that same day a revised offer which lowered the price to $1405 per MT and shortened the load window

(TRI 000007). It seems that the price was negotiated by both parties but load window change was requested by Vijay. Tricon gave Thirumalai a load ETA and an ETA for India. (TRI000016) Tricon's offer was valid until noon, India time on Friday, January 17, 2014. Lockwood sent the revised offer at 9:12 a.m. Houston time, which was 8:42 p.m. India time, on Thursday January 16. On January 17, at 10:42 a.m. India time, which was 11:12 pm on January 16 in Houston, before the expiration of the validity of Tricon's offer, Vijay emailed Lockwood written confirmation of Thirumalai's acceptance of the offer, but asked for 90 days' credit instead of 60 (TRI 000008). According to Lockwood, the 90 days credit terms had already been discussed by telephone and Lockwood had agreed. It is notable that Vijay's request to change the payment terms from 60 to 90 days did not have a validity term for acceptance or rejection. Not having a validity term is unusual if Vijay's email was a counter offer, but is consistent with Lockwood's statement that the 90 days credit terms had already been agreed to verbally. In my opinion, a deal had been made. It is also notable that on January 17, a little less than an hour after sending the acceptance, Vijay sent Thirumalai's financial reports for consideration by Tricon's credit department. (TRI 000056). This would not have been done if there was not a deal.

9. The price for OX dropped during the hours following Thirumalai's January 17 acceptance of Tricon's $1405 per MT offer. This is a risk that all companies take when buying and selling petrochemical or petroleum products. The industry depends on buyers and sellers making deals then preforming on the deal. When the prices change for

or against your company after a trader has made a deal, the trader knows that his or her company accepts the gain or loss. The moment a trader accepts an offer, a verbal contract is concluded and a contract exists. The industry could not function if the contracts were not started as a verbal agreement.

10. At 1:54 p.m. on Friday January 17 in Houston, which was 1:24 a.m. on Saturday January 18 in India, Vijay emailed Lockwood requesting Tricon reduce the price by $25 per MT because the OX price had fallen during the hours after he communicated Thirumalai's acceptance to Lockwood the morning of January 17 (in India) ( TRI000012). Lockwood responded via email a few minutes later, at 2:04 p.m. Houston Time (1:34 a.m. India Time) Lockwood told him that Tricon would not agree to change the price, explaining that they could not change the deal and that if the price had gone up after Thirumalai's acceptance, Tricon could not retroactively ask Thirumalai to change the deal. Vijay responded to this email early in the morning of Monday January 20 in Houston, which was 1:41 p.m. Monday in India, expressing his understanding, saying "Thanks, Brad. Sure, let's connect tonight." (TRI00015). If Vijay and Thirumalai believed that they did not have a contract they should have been adamant that they didn't purchase the OX and it should be noted in this email.

11. The information I have reviewed show that then the deal moved forward and Lockwood and Vijay discussed the specifics of the OX shipment. This is the normal path forward after a contract is completed.

12. On January 22 (12:17 a.m. in Houston, 11:47 a.m. in India), Lockwood sent

Vijay Tricon's written sales contract with Tricon's General Terms and Conditions, including an agreement to arbitrate (TRI000024-27). This is customary in petrochemicals trading and as mentioned in item number 6 above. After traders make a deal, companies "pass paper" to the other party. During this time other terms may be discussed and agreed or not agreed to. This does not mean that the deal was not made. Even if the companies do not agree to certain terms, there is still a valid contract.

13. On January 23, Vijay emailed Lockwood regarding the sales contract, asking to add two terms to the contract: (1) a term requiring Tricon to agree to abide by the Chennai port restrictions on low flash items; and (2) a term whereby Tricon agreed to pay for the charges associated with Thirumalai's opening the letter of credit for the deal (TRI000028). Vijay did not ask for any other changes to the terms and conditions. In my experience, neither of the above two items would be an issue. Port restrictions are a standard of the industry and the staff chartering the vessel would want that information prior to loading a vessel so the proper rotation of the vessel at discharge could be included in the charter. Seller paying for LC charges is not that uncommon. According to Lockwood, Tricon agreed to both. Arbitration agreements are the standard of international and domestic petrochemicals trading contracts. At times parties may request a change to the location of arbitration. In my experience parties never object to arbitration. If Thirumalai had concerns or issues with the terms of the agreement, including the arbitration agreement, it would have been standard industry practice for Vijay to raise them during their call or in the email he sent Lockwood reiterating the two

additional terms Thirumalai needed to add. Vijay never raised any concerns or objections with the terms and conditions in the sales contract other than to add the two additional terms, to which Tricon agreed.

14. No one in the industry would load product without an LC, prepayment or open credit. It is impractical to secure a vessel or begin to load a vessel without a guarantee of payment because it is too expensive to unload the material once it is loaded or to change the discharge port. Once the material is loaded, if the buyer does not pay, the seller has no alternative but to ship the material to a discharge port, store it, incurring costs, or try to find another buyer. Demurrage and/or changing a discharge port after a vessel has been chartered can be extremely costly. No company would take that risk unless forced to do so. With a letter of credit based deal, it is critical that the buyer secure the letter of credit before they chartered a vessel and it begins loading. Because this was Tricon's first deal with Thirumalai and Tricon had no history with Thirumalai, the risk of non-payment was critical.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2016.

*Steve C. Simpson*

Steve C. Simpson

**Steve C. Simpson**
3900 Buttercup Way
Plano, TX 75093
Cell: (210) 865-4760
steve.simpson@texasmn.com

---

SUMMARY

Twenty years trading Petrochemicals.  Thirty five plus years trading in crude oil, refined products, futures, specialty products and petrochemicals both in domestic and international markets.  Responsible for all transportation associated with the above products.  Possess excellent record of accomplishments in domestic and international markets including petrochemical, refined products, crude oil trading, marketing and supply as well as specialty products marketing, high level negotiations on long term and short term (spot) contracts in addition to new projects which include commercial development of petrochemical projects.  Demonstrated strong trading, marketing, purchasing, decision making and leadership skills at the executive level.


PROFESSIONAL EXPERIENCE

**TEXAS MOON NIGHT dba, CONSULTANT – San Antonio and Dallas, Texas          2008 – Present**
Responsible for MSAT II benzene marketing and transportation for Valero's Aromatic Project.  This project moved Aromatic Concentrate from 4 refineries to its Corpus Christi refinery to remove benzene from gasoline.  Advises and recommended trading opportunities for Valero's aromatics group plus wrote a weekly trading newsletter. I have been an expert witness for law firm of large trading company.

**VALERO ENERGY CORPORATION – Houston, Texas and San Antonio, Texas          1997 – 2008**
Executive Director – Petrochemicals    (2001-2008)
Responsible for trading, marketing and supply of 110,000 barrels per day of Valero's Petrochemical products, including P & L responsibility.  Over 1,000 spot and long term trades in the 11 years with Valero.  Managed staff to secure smooth operations within the Valero system.
- Responsible for petrochemical products from 18 refineries within the Valero system.  Products include mix xylene, toluene, benzene, toluene concentrate, aromatic concentrate, refinery grade propylene and chemical grade propylene).
- Developed new products and projects for Valero's refining system
- Integrated newly acquired refineries or sold refineries into or out of the Valero refining system

Director – Petrochemicals   (2000-2001)
Responsible trading, marketing and supply of 65,000 barrels per day of Valero's Petrochemical products, including P & L responsibility.  Managed staff to secure smooth operations within the Valero system.
- Responsible for petrochemical products from 6 refineries within the Valero system
- Products included mix xylene, toluene, benzene, aromatic concentrate, raffinate, mineral spirits, petroleum coke, sulfur, methanol, MSO and pseudocumene, MTBE, natural gas, and various other products
- Developed new products and projects for Valero's refining system
- Integrated newly acquired refineries into the Valero refining system

Manager – Petrochemical   (1997-2000)
Traded, marketed and supplied petrochemical products and specialty products in the Valero system.
- Integrated newly acquired refineries into the Valero system
- Worked with various refineries to develop new products with higher value for sale
- Developed new projects for Valero's refining system such as pseudocumene and mineral spirits

**RIO ENERGY INTERNATIONAL, INC – Houston, Texas**                                    1996 – 1996
Trader - Petrochemicals
Responsible for establishing, developing and trading petrochemicals and gasoline blendstocks
- Developed the trading of mix xylene, toluene, methanol, benzene, MTBE, reformate and gasoline blendstocks
- Increased net profits notably in 1996

**KERR-McGEE REFINING CORPORATION – Houston, Texas**                                 1989 - 1995
General Manager – Specialty Products Division (1990 – 1995)
Responsible for the marketing of specialty products which includes Petrochemicals (mixed xylene, toluene and benzene), Solvents, LPG's, Fuel Oil, Asphalt and other products produced by the three refineries.  Responsible for purchasing octane blend stocks, methanol, and other specialty chemicals and products, including P & L responsibility for the Specialty Products.
- Proposed, developed and contracted for the commercialization of cyclohexane unit resulting in a net profit of over $5 million for the first year of operation
- Organized, developed, implemented, hired and supervised the staff for Specialty Products with a budget of $2.5 million which resulted in the $6.6 million profit increase
- Developed and implemented the marketing of propylene at the Corpus Refinery which resulted in increased profits from $1.5 million to$ 4.5 million per year
- Traded over 48,000 BPD of products which generated revenues of over $350 million per year.
- Directed and managed the increase of sales and profits from the Cotton Valley's solvent refinery which resulted in over $2.5 million profit per year

Manager – Petrochemicals and Manager – Risk Management (1989-1990)
Responsible for the purchases and sales of all petrochemicals in addition to risk management and hedging program using futures trading.
- Marketed all petrochemicals with sales in excess of $150 million annually.
- Improved company's hedging market position by $1.7 million in less than four months
- Managed risk management position of over 5,000 futures contracts

**PETROTEX CORPORATION – Houston, Texas and London, England**                        1985 - 1989
President / Owner / Trader / Consultant

**CHARTER OIL COMPANY – London, England and Houston, Texas**                         1983 - 1985
Senior Trader – London (1983 – 1984)
Vice President – Product Supply and Distribution – Houston (1983)

**NORTHEAST PETROLEUM CORPORATION – Houston, Texas**                                 1981 - 1983
Vice President – Products and Crude Oil

**KERR-McGEE CORPORATION – Oklahoma City, Oklahoma**                                 1968 - 1981
Manager – International Crude Oil Supply & Transportation (1976 – 1981)
Supply Analyst (1974 – 1976)
Marketing Assistant – AG Chemical Division (1972 – 1974)
Pricing Specialist – Wholesale and Retail Product Pricing (1969 – 1972)
Senior Accounting Clerk – Marketing and Accounts Payable (1968 – 1969)

EDUCATION
B.S. Marketing/Business Administration-Southwestern Oklahoma State University, Weatherford, OK (1968)
Mid-level Management – Kerr-McGee Corporation, Oklahoma City, Oklahoma (1979)
Market Profile – Market Logic School, Chicago, Illinois and Sacramento, California (1987 – 1988)
